OLCOTT *et al.* *v.* POWERS *et al.*

(*Supreme Court, General Term, First Department.* June 26, 1891.)

RAILROAD MORTGAGES—COMMITTEE OF BONDHOLDERS—POWERS.

Pending proceedings to foreclose a railroad mortgage, the holders of the mortgage bonds entered into an agreement by which they authorized a committee of the bondholders, theretofore appointed, "to take such proceedings, give such directions, execute such papers, and do such acts, under the said mortgage or deed of trust or otherwise, as they may consider judicious in order to bring about an enforcement of the said security, and the payment of the principal and interest of the said bonds held by us, respectively, or so much thereof as may be collectible." The bonds were deposited with a trust company, subject to the disposal of the committee, and certificates reciting the agreement were delivered to the bondholders, the object of such deposit being stated in the agreement to be "in order that the said bonds held by us, respectively, and the coupons belonging thereto, may be used by the said committee for the purpose of bringing about a sale, foreclosure, or reorganization of the road, or for the purpose of realizing in our behalf, respectively, our respective proportions of the proceeds of any sale to which as holders of the said bonds we may be entitled." The agreement further authorized the committee, if an opportunity should arise, to make an arrangement or settlement of the claims on the bonds without resorting to foreclosure proceedings, "subject to confirmation by two-thirds in amount of the subscribers hereto, their representatives or assigns;" and provided that "if, during the continuance of this agreement, any event not herein provided for should arise in relation to any matter growing out of the duties hereby devolving upon the said committee, or if it may become necessary to, in any manner, alter, amend, or reconsider this agreement, * * * a meeting for the purpose shall be called by the committee, and shall be determined by a vote of the majority in interest present or represented by proxy, and such determination shall be binding as well upon the said committee as upon all the subscribers hereto, their representatives or assigns." *Held,* that a contract by the committee to sell the bonds to a third person, made by the committee pursuant to a resolution adopted by a majority of the bondholders at a meeting called by the committee to consider the proposition of the purchaser, and assented to by two-thirds of the stockholders, was valid, as against the non-assenting minority, and it was not necessary, at the called meeting of the bondholders, to amend or reconsider the bondholders' agreement.

Appeal from judgment on report of referee.

Action by Frederick P. Olcott and others against Deborah Powers and others. There was a judgment for defendants, and plaintiffs appeal.

Argued before VAN BRUNT, P. J., and BARRETT and PATTERSON, JJ.

*A. H. Joline,* for appellants.    *G. F. Canfield,* for respondents.

VAN BRUNT, P. J. There was substantially no dispute of fact upon the trial before the referee, and the question involved depends upon the construction of the agreement hereinafter mentioned. The controversy relates to the ownership of five consolidated mortgage bonds of the Scioto Valley Railway Company, with the coupons appertaining thereto, of the value of $7,039.50. The Scioto Valley Railway Company, an Ohio corporation, became involved in difficulties in the year 1885. It had issued several series of bonds, secured by mortgages upon its property, and, among others, it had made its "consolidated mortgage" to the Central Trust Company of New York, as trustee, to secure an issue of consolidated mortgage bonds. It made default in payment of interest on these bonds on July 1, 1885. In 1885, Collis P. Huntington,

a judgment creditor of the railway company, began a suit in the court of common pleas for Scioto county, Ohio, to marshal the assets of the company, ascertain and determine the amount of the liens upon it, and procure a sale of the property to satisfy his claim. On February 15, 1886, an agreement was made by the holders of consolidated bonds looking to united action on their part. This agreement, so far as necessary to be recited for the purpose of considering the questions raised upon this appeal, is as follows:

"Whereas, on the 7th day of September, 1880, the Scioto Valley Railway Company executed a mortgage or deed of trust, whereby it conveyed all its railroad property and franchise to the Central Trust Company of New York, as trustee, to secure the payment of the principal and interest of certain bonds of the said railway company, commonly known as the 'consolidated mortgage bonds,' which mortgage is by its terms a first and only mortgage lien on about thirty miles of said railway, and also a third lien on the remaining one hundred miles, more or less, thereof; and whereas, the interest upon the said consolidated mortgage bonds was made payable on the 1st day of January and the 1st day of July in each and every year until their maturity, on the 1st day of July, 1910; and whereas, the said mortgage provides that, whenever any interest upon the said bonds shall remain due and unpaid for the space of six months after demand, the trustee, at the request of one-third in amount of the said bondholders, may enter and foreclose; and whereas, default was made in the payment of the interest upon the said bonds which became due on the 1st day of July, 1885, which default still continues; and whereas, a receiver has been put in possession of the said railway, and proceedings have been begun by the holders of the so-called first mortgage bonds to foreclose their mortgage: Now, therefore, we, the undersigned, who are respectively holders of the said consolidated mortgage bonds to the amounts set opposite our names, respectively, as hereunto subscribed, in consideration of the advantages which shall result to us, respectively, from a concert of action in enforcing our legal and equitable rights as secured to us by the said mortgage, and for other good considerations, do hereby, each for himself and not the one for the other or either of the others, agree each with the others, and each with the committee hereinafter mentioned, as follows, that is to say:

"*First.* That we will act together in all matters touching the enforcement of our rights in the premises, and especially of the payment by the said railway company of the principal and interest of our said bonds, it being especially understood and agreed that whatever may be done under this agreement shall be subject to the stipulations herein contained, for our respective benefit, according to the amount of the said bonds held by us, respectively; and that, to facilitate and accomplish this end, we hereby ratify and confirm the action of the meeting of bondholders held in the city of New York on the 5th of November, 1885, appointing the following gentlemen a committee on our behalf, namely: Messrs. John W. Ellis, I. H. Archer, R. T. Colburn, Evans R. Dick, and Hugh L. Cole. And said committee are hereby authorized and empowered, as our attorneys, and in our names, to take such proceedings, give such directions, execute such papers, and do such acts, under the said mortgage or deed of trust or otherwise, as they may consider judicious in order to bring about an enforcement of the said security, and the payment of the principal and interest of the said bonds held by us, respectively, or so much thereof as may be collectible. That, in case a vacancy should at any time occur in the said committee, by death, resignation, or otherwise, such vacancy may be filled by a majority vote of the surviving members of said committee, subject to the confirmation of a majority in interest of the subscribers hereto, their legal representatives or assigns; and that such substitute shall have and exercise all the powers and authority under this agreement, previously possessed by the person in whose stead he shall have been selected and appointed, and to the same extent and effect as

if he were named one of the said committee herein. That no member of the committee shall be individually pecuniarily liable, nor liable for the acts of the others, nor for anything but his own willful misconduct.

"*Second.* That in order that the said bonds held by us, respectively, and the coupons belonging thereto, may be used by the said committee for the purpose of bringing about a sale, foreclosure, or reorganization of the road, or for the purpose of realizing in our behalf, respectively, our respective proportions of the proceeds of any sale to which, as holders of the said bonds, we may be entitled, we do hereby agree, at the time of the signing of this agreement by us, to deposit with the Central Trust Company of New York our bonds, to be held by it until the time of such sale, foreclosure, or reorganization, and then to be delivered upon request to the said committee, if they should require the same for any of the aforesaid purposes, provided that at the time of such deposit transferable certificates for such bonds and coupons, showing our right and title thereto, and that they are deposited under and subject to this agreement, shall be delivered to us, respectively; and we do further agree that for the purpose of meeting the expenses of the said committee in carrying into effect the provisions of this agreement, that each of the subscribers hereto shall pay into the hands of the said Central Trust Company, for the use of our said committee, the sum of five dollars upon each of the said bonds held by him, upon depositing the same under this agreement, and that the aggregate amount of such contributions shall constitute a fund for the payment of such expenses, and that no expenses beyond the amount of said fund shall be incurred by the said committee, unless they shall be authorized to do so by a vote of a majority in interest present at a general meeting under this agreement, to be called as provided in section fifth, in which case such further expenses may be incurred to the extent that shall be thus authorized, and each of the parties hereto shall contribute his *pro rata* proportion of the same.

"*Third.* If, during the continuance of this agreement, an opportunity shall arise for making an arrangement or settlement of our respective claims upon said bonds without resorting to foreclosure proceedings, and upon terms which the said committee shall consider advisable, they are hereby authorized to make such arrangement or settlement accordingly, subject to confirmation by two-thirds in amount of the subscribers hereto, their representatives or assigns.

"*Fourth.* That our committee is especially empowered to cause an appearance to be entered for us in any suits affecting our interests which have already been or which may hereafter be instituted in any state or federal court, and to take steps to protect our interests therein.

"*Fifth.* If, during the continuance of this agreement, any event not herein provided for should arise in relation to any matter growing out of the duties hereby devolving upon the said committee, or if it may become necessary to, in any manner, alter, amend. or reconsider this agreement, or to levy any additional assessment on the subscribers hereto beyond the amounts hereinbefore provided for, a meeting for the purpose shall be called by the committee, and shall be determined by a vote of the majority in interest present or represented by proxy, and such determination shall be binding as well upon the said committee as upon all the subscribers hereto, their representatives or assigns."

Under this agreement, up to and including April 2, 1889, consolidated mortgage bonds to the amount of $413,000, with unpaid coupons attached, were deposited with the Central Trust Company, and certificates issued therefor, such certificates providing that by receiving the same the holders assented to the agreement. Among the consolidated bonds so deposited were five numbered, respectively, 53, 54, 147, 148, and 135, and having thereunto annexed coupons maturing on and after July 1, 1885. The negotiable certificates rep-

resenting these five bonds were in the name of Pomroy Bros., and in due course were assigned and transferred to the respondents Deborah Powers & Son. On April 2, 1889, the "Cole committee" made an agreement with the firm of I. B. Newcombe & Co. and the Central Trust Company with reference to the consolidated bonds which had been deposited with the last-mentioned company under the agreement of February 15, 1886. This agreement was the result of a meeting of holders of consol certificates, called and held in New York April 2, 1889, in the manner prescribed by the agreement of February 15, 1886. At that meeting holders of certificates representing $261,000 out of $413,000 deposited consols were present. I. B. Newcombe & Co. made a proposition to acquire the deposited bonds. A discussion took place, and the proposition, in an amended form, was approved by a unanimous vote. The committee was directed to accept the proposition, subject to confirmation by two-thirds in amount of the certificate holders. The committee then met, and a memorandum agreement was made and approved, and signed by Mr. Dick, for the committee, and by the representative of I. B. Newcombe & Co. The formal written agreement was thereafter drawn up, and was subscribed by the parties. It was dated April 2, 1889; acknowledged May 10, 1889; and signed by Mr. Evans R. Dick, as chairman of the consolidated mortgage bondholders' committee. Mr. Dick signed it by "the direction of the bondholders, in meeting convened, as to substance, and by the direction of the said committee as to substance and form." Prior to May 10, 1889, the Cole committee issued a circular to the holders of said certificates, informing them that said committee had been instructed in writing by the holders of certificates representing 421 out of a total of 473 consolidated bonds deposited with the trust company to make the agreement. The agreement recited, among other things, that I. B. Newcombe & Co. had undertaken a reorganization of the Scioto Valley Railway, involving an issue of $4,000,000 new 4 per cent. first mortgage or consolidated mortgage bonds, and desired to acquire title to the bonds deposited under the Cole agreement, and provided for the delivery of new bonds for certificates representing old bonds, bond for bond. It further provided that I. B. Newcombe & Co. should buy back the new bonds, or buy the old certificates, on or before October 1, 1889, at 80, with interest from April 1, 1889, at 5 per cent. It was provided in the fifth article of the agreement that, "in case the said I. B. Newcombe & Co. elect to pay for the certificates in money, without the exchange of bonds having been made, the said committee will, upon the deposit of the necessary sums in the Central Trust Company, notify its certificate holders to deliver their certificates to the Central Trust Company for the account of I. B. Newcombe & Co., and receive payment for the same. When all such new bonds or sums of money shall have been so deposited, title to all the old consolidated bonds deposited under the agreement of July 15, 1886, shall vest in I. B. Newcombe & Co." The date "July 15" is no doubt a clerical error, as the bondholders' agreement is referred to in the preamble of the Newcombe agreement as "dated February 15, 1886." It was further provided by article 4 that the agreement should become binding as soon as certificates representing two-thirds in amount of the deposited consols should have been stamped as assenting thereto. In all there were $475,000 consols deposited under the Cole agreement, $413,000 of which were deposited before the meeting of April 2, 1889,—more than two-thirds in amount of the certificates assented to the Newcombe agreement. On May 13, 1889, an "agreement of purchase and reorganization of the Scioto Valley Railway Company" was made between a large number of holders of Scioto Valley securities; and the plaintiffs Olcott, Fry, and Hollins were made a committee thereunder, (Schedule A., annexed to complaint.) By instrument dated September 26, 1889, I. B. Newcombe & Co. transferred to the purchasing committee, the plaintiffs in this action, all the said consolidated bonds on deposit with the Central Trust Company, in consideration of the furnishing by

the committee and the payment to the Central Trust Company of the cash required to pay for the certificates in money. The sum of money required for this purpose was $259,875, being 82½ per cent. on $315,000 of certificates outstanding. Three hundred and fifteen thousand dollars, par value, was the entire amount of outstanding certificates representing deposited consols on October 1, 1889. The remaining certificates were all turned over to the committee by I. B. Newcombe & Co., and therefore no cash was required to meet them. Among the $315,000 of bonds for which there were certificates outstanding, and for which cash was paid into the trust company on October 1st, were the five bonds in question in this action. Of the $315,000 bonds, $310,000 drew their cash, leaving in the Central Trust Company, still applicable to the payment of the five outstanding certificates, the sum of $4,125, which is $825 for each certificate. The plaintiffs, as the assignees of I. B. Newcombe & Co., fully performed the provisions of the agreement of April 2, 1889, on their part.

About two months after the agreement was made, and on June 13, 1889, Mr. George F. Canfield, in reply to a circular issued by the Cole committee, notified Mr. Dick, the chairman of that committee, that he was the holder of certificates representing the five disputed bonds, and that he was opposed to the sale of the certificates on the terms stated in the circular, and that he forbade any action looking to the sale of such certificates at any less price than par and accrued interest. On June 20, 1889, Mr. Canfield sent a notice to the Central Trust Company denying the power of the committee to sell his bonds, and demanding delivery of them, and tendering his certificates. On September 19, 1889, Mr. A. E. Powers, one of the defendants, demanded of the Central Trust Company the delivery of the five bonds, and tendered the certificates. The reorganization proceeded thereafter in regular course. In the suit of Huntington against the Scioto Valley Railway Company and others, which was not a foreclosure action, but one brought by a judgment creditor under the provisions of the Ohio law to procure a sale of the debtor's property to pay the judgment, the Central Trust Company had answered; and on December 10, 1889, a decree was entered adjudicating the rights of the various parties, and the priorities of the respective liens, and directing a sale of the property to satisfy the amount due upon said liens. On January 22, 1889, a sale under the decree was made by Joseph Robinson, special master, and at such sale there was realized a sum sufficient to pay the full amount of principal and interest of all the consolidated bonds, namely, $1,407.90 per bond, which amount the court ordered the special master to distribute to the holders of consolidated bonds; and said sum was, on February 10, 1890, after the commencement of this action, distributed by the master. After the commencement of this action, which was begun on February 4, 1890, the five bonds in question were, through an oversight, delivered to the special master, together with all the other consolidated bonds in possession of the trust company, and, upon this being discovered, the master paid into the trust company $7,039.50, being the dividend amount applicable to the five bonds, and took a receipt therefor, stating that the bonds were in litigation between the purchasing committee and D. Powers & Sons, and the Central Trust Company agreed to hold the amount pending the litigation, and to pay it to the parties whom the courts should finally determine to be the owners of the bonds. In view of the claim by D. Powers & Sons, the Central Trust Company refused to deliver the bonds to the purchasing committee, and thereupon this action was brought to determine the ownership of the securities. The Central Trust Company answered, submitting its rights and duties to the decision of the court.

The defense and claim set up by the respondents Deborah Powers & Sons was to the effect that the consolidated bondholders' agreement did not confer upon the committee power to sell the bonds to third parties, but simply to col-

lect the money due upon the bonds, and that power to collect does not include power to sell. The learned referee coincided in this view, and gave judgment for said defendants D. Powers & Sons, and from such judgment this appeal is taken. There is no question but that, taking into consideration the recitals of the bondholders' agreement, it was in contemplation at the time that that agreement was signed that the rights of the holders of these bonds were to be enforced against the railway company by means of the bonds and mortgage, and that it was deemed for the advantage of all in the enforcement of their rights under the bond and mortgage that united action should be had. It was for this purpose that the combination was formed. This view is reinforced by the provisions of the second paragraph of the agreement, which provided that, "in order that the said bonds held by us, respectively, and the coupons belonging thereto, may be used by said committee for the purpose of bringing about a sale, foreclosure, or reorganization of the road, or for the purpose of realizing in our behalf, respectively, our respective proportions of the proceeds of any sale to which, as holders of said bonds, we may be entitled." This language clearly contemplated that the committee were to represent the holders of the bonds in the distribution of any proceeds which might arise from the enforcement of the claims of the bondholders under the mortgage or otherwise; and we think that, under the third clause of the agreement, where it speaks of the arrangement or settlement of their respective claims without resorting to foreclosure proceedings, it was contemplated that such settlement should be made with the debtor, and perhaps by agreement with the holders of other securities, and in no manner contemplated or conferred any power upon the members of the committee to make any sale or disposition of the bonds, but only to collect and compromise the debt. The fifth clause of the agreement, however, is of an entirely different character; and as, in our judgment, the decision in this case depends upon this clause of the agreement, it may not be improper to repeat its language again in this connection: "If, during the continuance of this agreement, any event not herein provided for should arise in relation to any matter growing out of the duties hereby devolving upon the said committee, or if it may become necessary to in any manner alter, amend, or reconsider this agreement, or to levy any additional assessment on the subscribers hereto, beyond the amounts hereinbefore provided for, a meeting for the purpose shall be called by the committee, and shall be determined by a vote of the majority in interest present or represented by proxy, and such determination shall be binding as well upon the said committee as upon all the subscribers hereto, their representatives or assigns."

It seems to us that, by means of this provision in the agreement, the unexpected was to be provided for; that it was considered safe that the decision of the majority in respect to the best means of realizing upon these bonds should control; and that, if the scheme as contained in the agreement was found ineffectual, and it became apparent that it was necessary to adopt a different method in order to realize upon these bonds, the committee should have the power so to do, provided their action was ratified by a majority of those present at a meeting called in the manner provided for by the agreement. It was in pursuance of this provision of the agreement, apparently, that the Cole committee called a meeting of the certificate holders, and submitted to them the proposition of Newcombe & Co. in reference to their bonds. The proposition was discussed at this meeting, and after amendment was approved by unanimous vote, and the committee were directed to accept the proposition subject to confirmation by two-thirds of the certificate holders, thus protecting, as far as possible, the interests of said holders. Pursuant to the power conferred upon the Cole committee, the agreement with Newcombe & Co. was signed and confirmed by 421 out of a total of 473 of the consolidated bonds. It is true that the original reorganization agreement was not formally altered or amended; but it certainly was reconsidered, and a new basis of

realization upon these bonds was presented, and not only adopted by a majority of the certificate holders, but by over two-thirds thereof.

There is no provision in the bondholders' agreement requiring its reconsideration to be reduced to writing: nor is the form provided for, except that it shall not be done unless at a meeting called for the purpose, and a vote of a majority of those present or represented by proxy shall be cast in favor of the proposed reconsideration or alteration. The fifth clause evidently was intended to meet unforeseen contingencies, and to bind the minority of these bondholders who had signed this bondholders' agreement to the action of the majority in case it became necessary, in the opinion of the majority and of the committee, to adopt some other scheme; and that a factious minority should not be able to prevent the carrying out of a scheme which, to the committee and to the majority of the bondholders, might seem for the advantage of all concerned. The language is: "If during the continuance of this agreement any event not herein provided for should arise." The event did arise when Newcombe & Co. made their proposition. The committee called a meeting of the certificate holders, submitted the proposition as made to them, and as amended it was overwhelmingly adopted. The learned referee in his opinion, in noticing this article of the agreement, bases his opinion upon the fact that no proposition to alter the agreement was submitted at the meeting of the certificate holders, and that what was submitted to the meeting, as he claims, appears to have been simply a proposition of Newcombe & Co. to purchase the bonds, which was assumed to have been in the power of the majority to accept and make binding on all parties to the agreement. If that was so, Powers & Co. are bound; otherwise not. The very submission of the proposition to the meeting of the bondholders, and its adoption, was a reconsideration of the agreement which that meeting was authorized by the provisions of the fifth article to do. It was submitting a different proposition, looking to the result of collection through a means which had not been contemplated by the original agreement, and this was an event not provided for in the agreement which arose. The committee had an opportunity to realize upon these bonds. They did not know what would be the result in case they awaited the ending of the foreclosure proceedings and the sale of the road. They deemed it for the advantage of these certificate holders to make a certainty of what was then an uncertainty.

But it is said that the Newcombe contract is not and does not purport to be a contract for the sale of the bonds. It is simply a contract for the sale of assenting certificates, and the bonds of such certificate holders as expressly assented to these terms. It seems to us that this is a very strained construction of the agreement. It was necessary that there should be some record kept of those who assented to this agreement, in order that it might ascertain when two-thirds of the certificate holders had assented; and, as the agreement could not become operative until such two-thirds had assented, it was a matter of some importance, and it was for that reason that the certificate holders were invited to present their certificates to the Central Trust Company to have them stamped, "Assent to the agreement," etc.

It is also true that throughout this agreement the certificates are the *indicia* of property which is spoken of, and not the bonds. But it is perfectly clear that as the bonds followed the certificates, and as holders of the certificates under the terms of the agreement would be entitled to the bonds, it is immaterial whether they spoke of bonds or certificates; and the agreement expressly provides that when Newcombe & Co. comply with their part of the agreement the title to all the old consolidated bonds deposited under the agreement should vest in Newcombe & Co. If it was not intended to bind the signers of the original reorganization agreement to this new arrangement, and only to bind those who assented to this new arrangement, what would have been the necessity of calling the meeting under the fifth

clause of the reorganization agreement? That shows clearly the intention with which this new agreement was entered into; and it was impossible for them to successfully carry out the negotiations, if there should be outstanding bonds which were not bound thereby. By the terms of the fifth clause already adverted to, the adoption by this meeting of the negotiation with Newcombe & Co. bound all the subscribers to the agreement, their representatives or assigns. It therefore does not seem possible to substantiate the claim that only the assenting certificate holders were bound by this arrangement. It is further claimed that the Newcombe contract was at most an executory contract to sell, and the title would not pass until the money was paid, and that long prior to that the powers of the Cole committee were revoked. Undoubtedly an attempt to revoke was made, but where parties enter into an agreement with each other containing mutual covenants, where it is apparent upon the face of the agreement that the signing by one is the inducement for another to sign, and that the agreement is entered into in order that all shall share alike in the result, and where it is apparent that it was the intention of the signers of this agreement that the will of the majority should control, it is difficult to see where the power of revocation comes in. In addition to that, upon the faith of this very agreement, moneys were subscribed for the purpose of carrying it into effect. If there was to be a power of withdrawal, what was the sense in providing that the determination of the meeting of certificate holders should be binding upon all the subscribers to the agreement, if each one of them had a right to withdraw when he pleased? It is somewhat difficult to see how he could be bound, if he need not remain a subscriber. It is clear that it was the intention of these parties that the subscribers to the agreement should be bound by its terms and conditions, that there should be no power of revocation, and that the majority should control in reference to the methods of realizing upon their bonds, in case the scheme contemplated in the agreement should be found inoperative. The whole basis of the agreement would necessarily fall if there was a power of revocation. Therefore, the holders of the bonds now represented by Powers & Sons having become parties to this agreement, Powers & Co. could not withdraw the securities from the pledge under which they had been placed. Upon the whole case, therefore, we are of opinion that the learned referee erred in holding that, under the circumstances, the committee had no power to make a sale of the bonds to Newcombe & Co., and that the judgment should be reversed, the order of reference vacated, and a new trial ordered, with costs to appellants to abide event. All concur.